Nathan R. Danks,
Plaintiff-Appellant,†

Regent Insurance Company,
Subrogated-Plaintiff-Co-Appellant,

v.

Stock Building Supply, Inc.,
James E. Wagner and
Pacific Employers Insurance Company,
Defendants-Respondents,

Norsemen Builders LLP,
Harold A. Feggestad,
Thomas M. Frei,
Harlan D. Norby,
American Family Insurance Company
and Pekin Insurance Company,
Defendants.

Court of Appeals

No. 2005AP2679. *Submitted on briefs April 12, 2006.*
*—Decided December 7, 2006.*

2007 WI App 8

(Also reported in 727 N.W.2d 846.)

† Petition to review filed.

350

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James W. Gardner, Douglas J. Phebus* and *Heather L. Curnutt* of *Lawton & Cates, S.C.*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Margery Mebane Tibbetts* and *Matthew D. Kuehl* of *Brennan, Steil & Basting, S.C.,* Janesville.

Before Dykman, Deininger and Higginbotham, JJ.

¶ 1. DEININGER, J. Stock Building Supply, Inc., a truss supplier to a residential construction project, hired C&R Concrete, a company performing other work on the project, to load a truss at the construction site onto Stock's truck. Nathan Danks, an employee of C&R Concrete, was injured while assisting in the truss removal. Danks appeals the judgment dismissing his personal injury claims against Stock and its truck driver, James Wagner, who was at the site to pick up the truss. Danks claims the circuit court erred in concluding on summary judgment that Stock and its driver were not negligent as a matter of law.

¶ 2. Because Stock retained an independent contractor (C&R) to remove the truss, Stock can be held liable for injuries sustained by the independent contractor's employee (Danks) only if Stock or its employee (Wagner) committed "affirmative acts of negligence." The undisputed facts in the record on summary judgment establish as a matter of law that neither Stock nor Wagner committed affirmative acts of negligence. We also conclude that WIS. STAT. § 895.045(2) does not provide an alternative basis for holding Stock liable for Danks' injuries. Accordingly, we affirm the judgment dismissing Danks' claims against these defendants.

## BACKGROUND

¶ 3. The following background facts are taken from the parties' submissions in support of and opposi-

tion to Stock's motion for summary judgment. Danks does not argue that disputed historical facts preclude the granting of summary judgment. Our recitation generally conforms to Danks' "statement of facts" in his opening brief.

¶ 4. Danks suffered a spinal cord injury while assisting his supervisor, the owner of C&R Concrete, in loading a truss onto a truck at a construction site. C&R performs concrete work for residential and small commercial projects. On the day of the accident, C&R was the concrete subcontractor for the construction of two residences in Edgerton. Norsemen Builders acted as the general contractor for the project and performed the carpentry work.

¶ 5. Norsemen purchased roof trusses for the project from Stock Building Supply, Inc., a company that sells building supplies and components, including trusses that are assembled at Stock's plant in Delavan. Stock delivers trusses to work sites in steel-banded bundles on a large flatbed truck. Once trusses are delivered to a construction site, the carpenter installs them on the house frame. This requires a crane to lift the trusses into position. Norsemen usually employed McCutchin Crane to lift and set trusses on its residential construction projects.

¶ 6. With each bundle of trusses it delivered, Stock included a packet of documents that contained a description of each truss and directions on how the trusses were to be arranged on the roof. Also included in the packet was a document published by the Truss Plate Institute, the "HIB-91 Summary Sheet," subtitled "Commentary and Recommendations for the Handling, Installing & Bracing Metal Plate Connected Wood Trusses." The HIB-91 publication provides safety information concerning the lifting and movement of trusses,

and it warns: "Do not lift single trusses with spans greater than 30' by the peak." The publication also indicates that a "tag line" (a thick rope attached to the truss) should always be used when lifting and moving trusses.

¶ 7. Stock delivered a bundle of trusses to the Norsemen construction site in Edgerton. A Norsemen representative received the trusses and the accompanying instruction packet. One of the trusses delivered to the site was a 47–foot, 270–pound gable-end truss that later failed and injured Danks. Because the gable-end truss would form the outer wall of the roof structure, Norsemen attached sheathing board to it, along with two-by-four "stiffeners." These additions increased the weight of the truss from 270 to 902 pounds, not including the stiffeners.

¶ 8. Norsemen workers completely sheathed the truss, leaving only a small triangular opening at its peak. The opening was intended to be used as a point for attaching a single cable to lift the truss. Norsemen workers soon discovered that the trusses Stock had delivered were two feet too long for the project. After a Stock representative visited the site, Stock acknowledged it had erred in sending improperly sized trusses to the Edgerton site. Stock agreed to remove the oversized trusses from the site.

¶ 9. Because Stock did not have a crane to lift the trusses onto its truck, it asked Norsemen who performed its truss transfers. Norsemen's regular crane service, McCutchin Crane, required advance scheduling. Stock wanted to remove the trusses on an empty flatbed trailer truck that was returning from a delivery. Given the time constraint, Norsemen suggested that its concrete subcontractor might perform the loading. C&R Concrete was on site and had a boom truck that it

354

used to handle cement forms. On behalf of Stock, Norsemen approached C&R's owner about loading the trusses onto Stock's truck. C&R agreed to do the work on terms acceptable to Stock and Stock authorized C&R to proceed.

¶ 10. C&R's owner had lifted unsheathed trusses approximately five times in the seven years preceding the accident. Neither Stock nor Norsemen provided C&R a copy of the HIB-91 Summary Sheet. Danks, who assisted C&R's owner with the lift and transfer, had some experience operating C&R's crane but none in lifting trusses. C&R's owner instructed Danks on the day of the accident regarding how the crane cable should be attached to a truss for the lift.

¶ 11. When its concrete work was completed on the day of the accident, C&R dismissed all of its workers except Danks who stayed to assist in loading the trusses. Approximately thirty minutes before the accident took place, Stock's driver, James Wagner, arrived at the site with a flatbed truck to pick up the oversized trusses. Upon Wagner's arrival, C&R's owner, Danks and two Norsemen employees were still on site. Wagner saw the sheathed, gable-end truss "[s]itting on top of the house" with the crane cable already connected to it. Danks, following the C&R owner's directions, had connected the truss to the crane by passing a cable through the small triangle left by Norsemen at the top of the truss. He did this by going inside the partially constructed house, climbing a ladder and connecting the cable to the truss. Danks' method of connection resulted in a one-point lift from the center of the truss.

¶ 12. Wagner and C&R's owner discussed where Wagner should position the truck to facilitate the loading process. Wagner turned his truck around and brought the truck into the agreed upon position. When

355

Wagner stopped his truck, the gable end truss was already moving through the air. Wagner could see that a two-point connection to the truss was not being employed and that no tag line was in use. When he stepped out of the truck, he saw Danks standing between the crane and the trailer. He told Danks "I wouldn't stand there, if I were you," and Danks moved back. Wagner then stood on the flat bed and used hand signals to direct C&R's owner, who was operating the crane, as to the direction the truss should move and when it should be lowered. Danks, meanwhile, from his position toward the rear of the flatbed, attempted to use a two-by-four to guide the truss so that Wagner could "grab the other end."

¶ 13. When the truss was approximately eight feet above the trailer, it failed at its peak and fell, coming to rest on the flat bed at an angle and too far to the right. Neither Wagner nor C&R's owner had Danks in view when the truss fell. Danks was discovered laying on the street near the rear of the Stock truck. Danks' expert opined that lifting the truss by a single point without the use of a tag line fell below the standard of care and, further, that if proper lifting techniques had been employed, the truss would not have failed.

¶ 14. Danks received worker's compensation benefits for his injuries from C&R's carrier, Regent Insurance Company. Danks, joined by Regent, brought this action against Norsemen and its principals, and Stock and its driver Wagner, alleging that all were causally negligent in producing Danks' injuries. Norsemen and its principals settled and are not a party to this appeal. Stock moved for summary judgment and the circuit court granted the motion, dismissing Danks' action

against it.[1] Danks appeals the judgment subsequently entered in Stock's favor.

## ANALYSIS

¶ 15. We review the circuit court's grant of summary judgment de novo, employing the same methodology as the circuit court. *See Estate of Thompson v. Jump River Elec. Coop.*, 225 Wis. 2d 588, 593, 593 N.W.2d 901 (Ct. App. 1999). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; WIS. STAT. § 802.08(2) (2003–04).[2] Although Danks argues that the circuit court should not have disposed of his negligence claims on summary judgment, as we have noted, he does not assert that disputed historical facts preclude summary judgment. Thus, the question we must decide is whether Stock is indeed entitled to judgment as a matter of law on the present record. Section 802.08(2).

¶ 16. Danks correctly points out that summary judgment is usually inappropriate on the question whether a party was negligent. *See Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 2, 241 Wis. 2d 804, 623 N.W.2d 751. In some cases, however, a plaintiff may fail to make a showing on summary judgment that either establishes or places in dispute that the defendant

---

[1] We refer in the remainder of this opinion to all defendants-respondents (Stock Building Supply, Inc., James Wagner and Pacific Employers Insurance Company), collectively, as "Stock."

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

negligently caused the plaintiff's injury. *See Fifer v. Dix*, 2000 WI App 66, ¶ 15, 234 Wis. 2d 117, 608 N.W.2d 740. A court should grant the defendant's summary judgment motion and dismiss the plaintiff's claims only if the court is " 'able to say that no properly instructed, reasonable jury could find, based on the facts presented,' " that the defendant was negligent. *See Lambrecht*, 241 Wis. 2d 804, ¶ 2. (citation omitted). Moreover, as we discuss below, the dispositive question in this appeal is whether Stock committed any "affirmative acts of negligence," which, on undisputed historical facts, is a question of law. *See Jump River*, 225 Wis. 2d at 601.

¶ 17. Generally, one who hires an independent contractor is not liable in tort for injuries sustained by an independent contractor's employee while he or she is performing the contracted work. *See id.* at 593–94. As we discuss in greater detail below, an exception to the general rule of "owner" non-liability to the employee of an independent contractor occurs when an owner commits an "affirmative act of negligence" that increases the risk of harm to the contractor's employee.[3] *See id.* at

---

[3] The person or entity that hires an independent contractor is variously referred to in Wisconsin case law as the "owner," "general contractor" or "principal employer." *See Estate of Thompson v. Jump River Elec. Coop.*, 225 Wis. 2d 588, 591 n.1, 593 N.W.2d 901 (Ct. App. 1999). In order to avoid confusion stemming from the facts that Norsemen was the general contractor for the construction project and C&R was Danks' employer, we will use the term "owner" in this opinion when referring to the entity that retains an independent contractor to perform a certain task. The term also seems appropriate on the present facts because Stock was the owner of the trusses which it engaged C&R Concrete to load onto its truck.

600–01. Without expressly arguing that C&R Concrete was *not* an independent contractor retained by Stock to perform the task of loading its truss onto its truck, Danks contends in his opening brief that Stock should be held liable for its negligent acts or omissions that contributed to causing the injury-producing accident, even if Stock's conduct fell short of "affirmative acts of negligence."

¶ 18. Danks' contention that Stock may be held liable for ordinary causal negligence on the present facts rests on two alternative theories. First, Danks claims that Stock retained sufficient control over the truss-loading operation that it forfeited any immunity for negligent acts or omissions that might otherwise be available to an owner who retains an independent contractor. Second, Danks contends that, even if Stock cannot be held vicariously liable for C&R's negligence absent an affirmative act of negligence on Stock's part,

We also note that the general rule that an owner is not liable for its acts or omissions except those constituting "affirmative acts of negligence" applies where the plaintiff is an employee of an independent contractor who is injured while performing the contracted work. The rule does not necessarily apply if the injured plaintiff is a third-party unrelated to the contracting parties, such as a bystander, or when a contractor's employee seeks damages for a workplace injury from other than a contracting owner, for example, in an action against the manufacturer of an allegedly defective product utilized in performing the work. The rule that an owner is liable to an employee of an independent contactor only for affirmative acts of negligence is based in part on the recognition that the employee will be compensated by worker's compensation for a workplace injury and the owner will have contributed to that compensation via its contract payments to the independent contractor. *See Wagner v. Continental Cas. Co.*, 143 Wis. 2d 379, 397–400, 421 N.W.2d 835 (1988).

Stock remains liable for its own negligent acts or omissions that were a substantial factor in causing Danks' injury. We reject Danks' claims, both of which are based in part on a misreading of applicable precedents, fostered perhaps by some arguably imprecise language appearing in those precedents.

¶ 19. In support of his claim that there is a "retained-control exception" to the immunity enjoyed by an owner regarding injuries sustained by an employee of an independent contractor who is injured while performing the contracted task, Danks points to *Snider v. Northern States Power Co.*, 81 Wis. 2d 224, 260 N.W.2d 260 (1977). The supreme court at one point in its opinion refers to "the retained-control exception" to the general rule of owner non-liability for an independent contractor's negligence. *See id.* at 239. It is clear from the court's earlier discussion, however, that the question of who controlled the work goes to whether a true independent contractor relationship exists. *See, e.g., id.* at 232 ("The most important single criterion in determining whether a person is an independent contractor is the degree to which the owner, rather than the independent contractor, retains the right to control the details of the work.").

¶ 20. Thus, if an owner retains the right to control the details of the work, no true independent contractor relationship exists between the owner and the person or entity the owner hires to do the work, and the "general rule" of owner non-liability simply does not apply. Once it is determined, however, that an owner relinquished control of the details of the work to an independent contractor, the focus of the inquiry shifts, as we discuss below, to whether an exception to the general rule of owner non-liability exists. As to whether

C&R was indeed an independent contractor with respect to the loading of the truss, Stock claims Danks conceded the point during argument in the circuit court. In his reply brief, Danks disputes that he conceded that C&R acted as an independent contractor when loading the truss or that he waived any argument regarding Stock's alleged retention of control over the loading operation. We accept Stock's waiver argument.

¶ 21. The following exchange between the circuit court and Danks' counsel occurred during argument on Stock's summary judgment motion:

> THE COURT: [Counsel], you agree that Lubbe [C&R's owner] and C&R Concrete are independent contractors with Stock?
>
> [DANKS' COUNSEL]: I don't know if I specifically—if I'd say—they were certainly hired by Stock through Norsemen to do a job. They are not Stock employees, if that's the question. If the correct terminology is they're an independent contractor for Stock, I guess I wouldn't disagree with that.
>
> THE COURT: All right. Then is the standard not showing of affirmative negligence on the[ir] part for there to be liability?
>
> [DANKS' COUNSEL]: I believe that the standard is that they have to be affirmatively negligent and I believe that that's what we argued in our brief.

In its written decision, the circuit court noted that, "[a]t oral argument . . . [Danks] conceded that regardless of Stock's proper categorization, Stock must have committed affirmative negligence to be liable."

¶ 22. We have reviewed the transcript of the circuit court's oral decision delivered on September 22, 2005, and the record following the entry of the court's

written decision on September 23. We find no indication that Danks attempted in any way to correct the court's impression that Danks had waived any argument that Stock could be held liable on some showing other than an affirmative act of negligence. Accordingly, we agree with Stock that, on the record before us, Danks conceded that Stock hired C&R as an independent contractor for the task of loading the truss, and he waived any argument that Stock retained sufficient control over the truss loading operation to render it liable for any negligent acts or omissions that were not affirmative acts of negligence. *See State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) ("We will not . . . blindside trial courts with reversals based on theories which did not originate in their forum.").

¶ 23. We thus turn to Danks' second rationale for why the "ordinary" negligence standard should apply to Stock in this case. He claims that a showing that Stock committed an affirmative act of negligence is only required in order to hold Stock vicariously liable for C&R's negligence in lifting the truss. According to Danks, Stock remains fully liable for its own negligent acts or omissions that may have contributed to causing Danks' injuries, irrespective of whether Stock's conduct constituted an affirmative act of negligence. We reject this argument as well. Not only does Danks' concession in the circuit court preclude his present argument, but the argument lacks merit. The precedents make clear that, once it is determined that an independent contractor relationship exists, the entity that hires an independent contractor becomes liable for injuries sustained by an employee of the contractor *only* if that entity commits an "affirmative act of negligence," that is, engages

in " 'active misconduct' creating a new risk of harm to the plaintiff."[4] *Jump River*, 225 Wis. 2d at 601.

¶ 24. Some confusion on this point perhaps stems from the following discussion in *Wagner*:

> Wisconsin follows the general rule that a principal employer [i.e., "owner," see footnote 3] is not liable to others for the torts of independent contractors. *Lofy v. Joint School Dist. No. 2*, 42 Wis. 2d 253, 263, 166 N.W.2d 809 (1969). Plaintiff asserts that this court has previously recognized two exceptions to this general rule to hold a principal employer responsible to an independent contractor's employee. First, a principal employer may be liable to the independent contractor's employee for injuries caused by the principal employer's affirmative act of negligence. *Barth v. Downey Co., Inc.*, 71 Wis. 2d 775, 239 N.W.2d 92 (1976). Second, a principal employer may be held vicariously liable for the negligence of an independent contractor when the contractor's employee is injured while performing inherently dangerous activities. *Snider v. Northern States Power Co.*, 81 Wis. 2d 224, 260 N.W.2d 260 (1977).

*Wagner v. Continental Cas. Co.*, 143 Wis. 2d 379, 388, 421 N.W.2d 835 (1988). The introductory sentence stating that the general rule deals with an owner's liability "to others for the torts of independent contractors," and the reference in the last sentence to an owner being held "vicariously liable for the negligence of an independent contractor," *id.*, suggest that the rule and its exceptions govern only an owner's vicarious liability for the acts or omissions of an independent contractor.

---

[4] The cases also discuss a second exception to the general rule that an owner is not liable for worksite injuries sustained by an independent contractor's employee: when the owner has a "nondelegable duty" because the contracted work is "abnormally dangerous" or "extrahazardous." *See Jump River*, 225 Wis. 2d at 595–96 & n.5. Danks does not claim that this second exception applies on the present facts.

¶ 25. Reading the quoted passage in that manner would mean, as Danks argues here, that an owner's liability for its own negligent acts and omissions remains unaffected by the "general rule" and is subject to the "ordinary" standards for determining causal negligence. The balance of the *Wagner* opinion, however, as well as other pertinent case law, make clear that an owner is *not* liable to an employee of an independent contractor for its own negligent acts or omissions unless the owner's conduct constitutes affirmative negligence, i.e., "active misconduct" that increases the risk of harm to the employee.

¶ 26. For example, the plaintiff in *Wagner*, an injured employee of an independent contractor, attempted to recover from the owner for its "negligent hiring" of the independent contractor. *Wagner*, 143 Wis. 2d at 389. The plaintiff's claim was thus clearly based on the owner's allegedly negligent act or omission, not on vicarious liability for acts or omissions of the independent contractor. The supreme court, relying on its prior decisions in *Barth* and *Snider*, rejected the plaintiff's claim, concluding that negligent hiring was not "active misconduct":

> In the case at bar, the defendants failed to check the credentials of the independent contractor or make other inquiries. This failure cannot be seen as active misconduct constituting an affirmative act; rather, it was a "passive inaction or a failure to take steps to protect" the plaintiff from harm. Accordingly, we hold as a matter of law that the plaintiff could not recover from defendants on this basis; negligent hiring does not by itself constitute an affirmative act of negligence upon which the liability of a principal employer to a contractor's employee can be based.

*Id.* at 390 (citation omitted).

¶ 27. Similarly, the plaintiff's claim in *Barth* was that the owner had pressured the independent contractor to hasten its work. *Barth*, 71 Wis. 2d at 782. The supreme court explained that an owner's simple or ordinary negligence would not suffice to hold the owner liable to the employee of an independent contractor and that a showing of " 'affirmative acts' of negligence" would be required. *Id*. at 783 (citation omitted). And, in *Snider*, an independent contractor's employee sued an owner, asserting that the owner's "failure 'to furnish supervisory control over its various contractees' constituted affirmative negligence." *Snider*, 81 Wis. 2d at 239. Citing *Barth*, the supreme court explained that, for an owner to be liable for injuries sustained by an employee of an independent contractor, the owner must be shown to have committed affirmative acts of negligence. *Id*. at 238. The court concluded that the plaintiff's allegation that the owner had failed to properly supervise the independent contractor's work was at best an "omission," and, thus, not a basis for owner liability. *Id*. at 239.

¶ 28. Finally, the injured employee's claim in *Jump River* was that the owner should be liable because its agent, the project engineer, had negligently designed the project and failed to incorporate safety precautions into the design. *Jump River*, 225 Wis. 2d at 601. Relying on *Wagner*, we explained that the owner would be liable to an employee of an independent contractor only if it had engaged in affirmative acts of negligence, that is, active misconduct. *Id*. at 600–01. We concluded that, although it was "not always easy to draw the line between active and passive conduct," the design and safety precaution failures alleged by the plaintiff were not affirmative acts of negligence, but acts of omission, "a 'failure to protect the plaintiff from harm.' " *Id*. at 601–02 (citation omitted).

¶ 29. Thus, the cited precedents establish, contrary to Danks' contentions, that Stock may be found liable for Danks' injuries only upon a showing that Stock committed one or more affirmative acts of negligence. We thus turn to Danks' contention that the record on summary judgment shows Stock committed affirmative acts of negligence, that is, that Stock engaged in active misconduct that increased the risk of harm to Danks. *See id.* at 601.

¶ 30. Danks' argument that Stock committed affirmative acts of negligence blends to some degree with his assertion that Stock committed acts and omissions of "ordinary" negligence for which Stock should be liable. Danks clearly asserts, however, that at least the following actions by Stock should be deemed "affirmative acts of negligence": (1) Stock's truck driver (Wagner) "was actively involved in the loading process, . . . controlling and directing the lift"; (2) the driver directed "Danks to move from what turned out to be a position of safety"; and (3) Stock expected its drivers to know the proper procedures for safely lifting and loading trusses but failed to provide proper training to its drivers. Although argued in a later portion of his brief addressed to Stock's alleged liability for its own "ordinary" negligence, Danks also cites Stock's error in delivering wrong-sized trusses to the work site as an affirmative act of causal negligence on Stock's part. The circuit court concluded that none of the actions Danks cited were affirmative acts of negligence that contributed to Danks' injuries. We agree.

¶ 31. There is no dispute that, upon arriving at the work site, Stock's driver conferred with C&R's owner, who was in charge of lifting and loading the truss. The driver also positioned his truck so as to

366

facilitate the loading of the truss into a proper position on the truck bed and, further, he participated in the lowering of the truss onto the truck by giving hand signals to the crane operator.[5] We agree with the circuit court that none of these activities constituted negligence of any kind, let alone "affirmative acts of negligence," and neither did these actions play a role in causing the accident and Danks' injuries. It is undisputed that the cause of the accident, and thus of Danks' injuries, was the improper one-point connection of the crane cable to the truss and, perhaps, the failure to employ a tag line during the lift, actions or omissions attributable solely to Danks and his employer.

¶ 32. Danks had hooked up the truss to the crane cable before Stock's truck driver even arrived at the site. The truss was in mid-air, having been hoisted by the crane, prior to the driver's exiting his truck after positioning it and before the driver gave any hand signals to the crane operator. The driver thus did not participate in, let alone "control," the truss connection and lifting operations, his participation being limited to

---

[5] Danks combines some of his arguments on "active misconduct" with assertions of "retained control." For instance, the truck driver's participation in the truss loading operation by positioning his truck and giving hand signals during the lowering of the truss are cited by Danks as showing both an affirmative act of negligence and that Stock retained control over the truss-loading task. Danks criticizes the circuit court for overlooking the "threshold inquiry" regarding Stock's retention of "substantial control over crucial aspects of the activity which resulted in his injuries." As we have discussed above, however, Danks' attorney conceded during argument in the circuit court that Danks' employer was acting as an independent contractor with respect to the lifting and loading of the truss, and, thus, the circuit court's failure to address the "retained control" issue is both understandable and not grounds for reversal.

assisting with the proper positioning of the truss on his truck bed as the truss was being lowered. In short, the improperly hoisted truss was dangling above Danks, essentially an accident waiting to happen, before the driver took any part in the loading operation. Nothing the driver did at the scene increased the risk that the truss would fail and injure Danks, and Stock's driver therefore committed no affirmative act of negligence as defined by Wisconsin case law.

¶ 33. It could certainly be argued that the driver was causally negligent because (1) he was in a position to see that the truss was improperly attached to the crane cable and that no tag line was being employed; (2) the driver could thus have warned Danks or C&R's owner that the truss was being lifted and moved in an improper and hazardous manner; and (3) he failed to do so. The driver's conduct was at most "passive misconduct," however, an omission on the driver's part, not an affirmative act of negligence that increased the risk of harm to Danks from the loading operation.

¶ 34. As for the driver's remark to Danks that "I wouldn't stand there, if I were you," we conclude this falls far short of a "direction" to Danks to stand in a certain place during the lowering of the truss, or even to not stand in a certain place. The driver did not, as Danks contends, "direct" or "instruct" Danks to move to any particular location, thereby placing him in greater peril. The driver's remark was, at most, advice which Danks was free to follow or ignore, given that he was under his employer's supervision and direction, not the driver's. The facts as reflected in the record, as opposed to how Danks characterizes them, are that the driver advised Danks that he might be standing in a hazard-

ous location, advice which the record does not establish was incorrect or negligent.[6]

¶ 35. Danks' third asserted act of affirmative negligence is also easily disposed of. The alleged failure on Stock's part to properly train its drivers regarding the safe and proper handling of trusses during lifting and loading operations is, on its face, a pure "failure to act," that is, an omission that is not an affirmative act of negligence as defined by Wisconsin case law. As the supreme court said of the negligent hiring claim in *Wagner*, "[t]his failure cannot be seen as active misconduct constituting an affirmative act; rather, it was a 'passive inaction or a failure to take steps to protect' the plaintiff from harm." *Wagner*, 143 Wis. 2d at 390.

¶ 36. Finally, we turn to Danks' claim that the circuit court gave too little consideration to his assertion that Stock's delivery of the wrong-sized trusses to the work site contributed to his injuries by starting the chain of events that led to the accident. We again agree with the circuit court judge, who concluded that the delivery to the work site of the wrong-sized truss that ultimately failed, although no doubt an affirmative act on Stock's part (and perhaps a breach of contract), is simply too remote from the accident as a matter of public policy to hold Stock liable for Danks' injuries on

---

[6] Danks asserts that the driver gave him a "direction" to move from "what turned out to be a position of safety" into one of harm, but he does not cite to any evidence in the record showing that, had Danks remained where he was initially standing when the driver offered his advice, he would not have been injured when the truss failed and fell.

that account.[7] *See Alvarado v. Sersch*, 2003 WI 55, ¶ 17, 262 Wis. 2d 74, 662 N.W.2d 350. If we were to accept Danks' contention, the owners of the house being constructed could also be liable for "causing" Danks' injury because, had they not decided to build a house, Danks would not have been injured while helping to build it.

¶ 37. Accordingly, we conclude the circuit court properly dismissed Danks' claims against Stock on summary judgment because Stock could be held liable for Danks' injuries only if it committed an affirmative act of negligence, which, on the undisputed facts of record, it did not do.

¶ 38. As an alternative theory of liability, Danks asserts that Stock is liable to Danks under WIS. STAT. § 895.045(2) because Stock and C&R acted "in accordance with a common scheme or plan." The cited statute, under the caption "CONCERTED ACTION," provides that "if 2 or more parties act in accordance with a common scheme or plan, those parties are jointly and severally liable for all damages resulting from that action." Section 895.045(2). Danks seems to believe that the statute creates an independent cause of action that would allow him to avoid the substantive law that governs an owner's liability for injuries sustained by the employee of an independent contractor. The statute does no such thing.

_____

[7] We note that Danks' argument relates solely to the improper size of the truss, which necessitated its removal from the work site, and hence, led to Danks' involvement with it. Danks makes no claim that the truss was defective or inherently dangerous, it being undisputed that the accident was caused by the improper handling of the truss, not its manufacture.

¶ 39. WISCONSIN STAT. § 895.045(1) sets forth Wisconsin's law of comparative negligence, specifying when a negligent plaintiff may recover from a negligent defendant. It also spells out Wisconsin law regarding joint and several liability among defendants, specifying when a given defendant may become liable for all damages assessed against multiple tortfeasors. Thus § 895.045(2) applies only *after* a judge or jury has determined, under applicable substantive law, that more than one tortfeasor is liable in some measure to the plaintiff. Subsection (2) simply modifies subsection (1) of the statute to provide that all defendants who are legally responsible for causing a plaintiff's damages, and who acted in concert in so doing, are jointly and severally liable for the plaintiff's damages, irrespective of whether a given defendant's apportioned causal negligence is less than 51%.

¶ 40. In short, WIS. STAT. § 895.045(2) plays no role in determining *whether* a given defendant may be held liable to the plaintiff. The circuit court in its summary judgment ruling put it this way: "Nothing in sec. 895.045(2) or related case law or general law suggests that this section can be used to impose liability on a party who is not negligent. Therefore, this section could not be used to keep Stock in this lawsuit despite a finding that there is no evidence of negligence." The circuit court's statement accurately and succinctly states the law.

## CONCLUSION

¶ 41. For reasons discussed above, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.

¶ 42. DYKMAN, J. (*concurring*). I agree with the majority's mandate, but I would conclude that Danks'

371

complaint should be dismissed because, in retrospect, it appears too highly extraordinary that Stock's negligence in building a too-long truss should have resulted in the injury to Danks. *See Alvarado v. Sersch*, 2003 WI 55, ¶ 17, 262 Wis. 2d 74, 662 N.W.2d 350.